NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| C.J. HESSE, INC. and ATLANTIC PIER CO., INC., <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN FAMILY HOME INSURANCE CO., <br><br> Defendant. | Civil Action No. 25-1101 (RK) (JBD) <br><br> **OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon Plaintiffs C.J. Hesse, Inc. ("Hesse") and Atlantic Pier Co., Inc.'s ("Atlantic Pier," and together with Hesse, "Plaintiffs") Motion for Summary Judgment (ECF No. 14, 14-3, "Pl. MSJ") and Defendant American Family Home Insurance Co.'s ("Defendant") Cross-Motion for Summary Judgment (ECF No. 12, 12-1, "Def. C-MSJ"). Defendant opposed Plaintiffs' Motion for Summary Judgment, (ECF No. 12), and Plaintiffs replied ("Pl. Reply," ECF No. 15). Likewise, Plaintiffs opposed Defendant's Cross-Motion for Summary Judgment, (ECF No. 15), and Defendant replied ("Def. Reply," ECF No. 13).

The Court has carefully considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiffs' Motion for Summary Judgment is **DENIED**, Defendant's Cross-Motion for Summary Judgment is **GRANTED**, and Plaintiff's Complaint is **DISMISSED**.

I. **BACKGROUND**

At issue in this lawsuit is whether Defendant (an auto insurer) was legally obliged to defend Plaintiffs (a general contractor and a property owner who leased the property to a third-party landfill operator) in six separate, since settled or dismissed state court lawsuits which sought damages for personal injuries and property damage from accidents involving third-party municipal garbage trucks at the landfill. (Pl. MSJ at 1–2.) Plaintiffs maintained a commercial automobile insurance policy with Defendant, and Plaintiffs contend that this policy encompassed the third-parties who owned and operated the garbage trucks that drove onto the landfill. Defendant's position is that "the claims asserted in the [state court] complaints d[id] not arise out of [Plaintiffs'] ownership, maintenance or use of a covered *auto*, and instead, the claims against [Plaintiffs] ar[o]se out of their alleged ownership or operation of the *premises* where the accident took place." (Def. C-MSJ at 10 (emphasis added).)

At the time of the underlying accidents, Plaintiff Atlantic Pier had leased the landfill to third-party Ocean County Landfill Co., Inc. ("O.C. Landfill"), who was then the sole operator of the landfill; indeed, Atlantic Pier appears to have been nothing more than an absentee landlord collecting rent on the property. (P-SUMF ¶¶ 17–18; Teleconference Transcript, dated September 24, 2025 ("Transcript") at 4:19–5:06.) Following the inception of this instant case, Plaintiffs represented that O.C. Landfill's insurance carrier had agreed to settle four of the six underlying lawsuits, which all involved claims for property damage. (Pl. Reply at 1.) Later, at an on-the-record teleconference on September 24, 2025, Plaintiffs represented that they were voluntarily dismissed from the remaining two state cases involving claims for personal injuries. (Transcript at 6:06–06:12.) Thus, as the parties agreed at the teleconference, all that remains for the Court to determine is whether Defendant had a duty to defend Plaintiff in those six lawsuits, which would

2

consequently entitle Plaintiff to approximately half-a-million dollars in litigation costs and fees. (*Id.* at 7:01–06, 8:05–08.)

### A. FACTUAL BACKGROUND[1]

1. The Landfill

Plaintiff Atlantic Pier is the sole owner of the real property where Ocean County Landfill (the "Landfill") is located in Manchester, New Jersey. (P-SUMF ¶¶ 5, 16.) Instead of operating the Landfill itself, Atlantic Pier leased the property to O.C. Landfill, a separate corporation that is licensed by the New Jersey Department of Environmental Protection, who maintained sole possessory interest to operate the Landfill. (*Id.* ¶ 17–18; *see* Transcript at 3:03–4:08.) Beyond leasing out the Landfill and collecting rent, there are no allegations that either Atlantic Pier or Plaintiff Hesse, a general contractor who neither owns nor operates the Landfill (P-SUMF ¶ 19), oversaw O.C. Landfill's operations of the Landfill or were in any way involved in the day-to-day management of the Landfill. (*See* Transcript at 4:09–12 ("Atlantic Pier owns the property, it's leased to [O.C.] Landfill, and the landfill is operated on the premises only by the tenant. The landlord [i.e., Atlantic Pier] is not permitted by law to operate the landfill."), 4:19–21 (Court: "So in other words, Atlantic Pier is what I would refer to as an absentee landlord?" Counsel: "Correct.").)

2. The State Court Lawsuits

Beginning in 2021, a series of four accidents involving municipal garbage trucks and their drivers took place at the Landfill, causing bodily harm, property damage, or both. (*See id.* ¶¶ 6–7.) These four accidents precipitated the filing of six separate lawsuits in New Jersey. (*Id.* ¶¶ 4–5.)

---

[1] In addition to their briefing, both parties submitted Statements of Undisputed Material Facts. ("P-SUMF," ECF No. 14-2; "D-SUMF," ECF No. 12-2.) Notably, however, the material facts necessary to decide the Motion and Cross-Motion for Summary Judgment are not in dispute. *See* Fed. R. Civ. P. 56(a).

3

While each of these cases has since been resolved as it relates to the Plaintiffs—either via settlement or voluntary dismissal—the underlying facts of each case are relevant for determining Defendant's duty to defend.

    a. *The* Alton *Cases: Case Nos. OCN-L-2173-23 & OCN-L-2717-24*

On September 23, 2021, Gerald Alton, a garbage truck driver for Brick Township, alleged that he was legally on the premises of the Landfill when his truck was caused to overturn with him inside "due to . . . hazardous condition(s) that existed on the premises/property, including . . . unstable roadway/landfill surface, within the premises that caused his truck to overturn." (ECF No. 12-4 ¶¶ 3, 5.) Alton sued Atlantic Pier, Hesse, and approximately a dozen others for personal injuries he sustained in the accident, which included a claim of loss of consortium by Alton's wife. (*Id.* at 1, 10.) Brick Township separately brought suit for the property damages sustained by Alton's garbage truck (totaling $71,800), arguing that the defendants "cause[d] the sites where garbage was unloaded to become unsafe for garbage vehicles to travel and perform their duties." (ECF No. 12-5 ¶¶ 20, 21.) As stated, both suits have since resolved as to Plaintiffs: Plaintiffs were voluntarily dismissed from the suit brought by the Altons, and the suit brought by Brick Township settled.

    b. *The* Barnshaw *Cases: Case Nos. OCN-L-2585-22 & OCN-L-1266-23*

On October 1, 2021, William Barnshaw, another garbage truck driver for Brick Township, allegedly sustained "serious and permanent injuries," as well as loss of consortium, after his garbage truck tipped over at the Landfill. (ECF No. 12-6 ¶¶ 1, 5, 10–12; *see* ECF No. 12-7 ¶¶ 20–21.) Barnshaw sued a number of defendants, including Atlantic Pier and Hesse, and asserted that they "negligently and carelessly allowed a dangerous and hazardous condition to exist on the [Landfill] or failed to warn of same." (ECF No. 12-6 ¶ 4.) Brick Township separately brought suit

for the property damage sustained by Barnshaw's garbage truck (totaling $77,751.67), arguing again that the defendants "cause[d] the sites where garbage was unloaded to become unsafe for garbage vehicles to travel and perform their duties." (ECF No. 12-7 ¶ 20.) As stated, both suits have since resolved as to Plaintiffs: Plaintiffs were voluntarily dismissed from the suit brought by the Barnshaws, and the suit brought by Brick Township settled.

    c. *The* Stafford *Cases: Case Nos. OCN-L-1546-24 & OCN-L-1209-24*

The final two cases were brought by Stafford Township, New Jersey ("Stafford") solely for property damage to two of their municipal garbage trucks (*i.e.*, without a corresponding personal injury case): *first*, on July 6, 2022, "debris and/or a protruding object at the Landfill struck" a garbage truck driven by Ken Widmer shortly after he dumped garbage at the Landfill, which caused "leakage of oil and subsequent disabling damage to the [t]ruck's engine" totaling $65,376.43. (ECF No. 12-8 ¶¶ 21–24.) *Second*, and similarly, on February 7, 2023, "debris and/or a protruding object at the Landfill struck" a garbage truck driven by Michael Smith, causing $65,966.42 in damage. (ECF No. 12-9 ¶¶ 21–25.) As stated, both suits have since settled.

    3. Defense and Indemnification by Defendant

After the *Alton* and *Barnshaw* cases were filed, Plaintiffs provided notice to Defendant, their auto insurance carrier, seeking indemnification and for the carrier to provide legal counsel. (P-SUMF ¶ 11.) The following year, after the *Stafford* cases were filed, Plaintiffs again provided notice to Defendant.[2] (*Id.* ¶ 12.) Plaintiffs contend that under their auto insurance policy with

---

[2] It is undisputed that Plaintiffs' initial insurance policy with Defendant was in effect from April 1, 2021 through April 1, 2022. (P-SUMF ¶ 1; D-SUMF ¶ 1.) The *Alton* and *Barnshaw* cases resulted from incidents that arose during the covered period. (*See* ECF Nos. 12-4 (Sept. 23, 2021), 12-5 (same), 12-6 (Oct. 1, 2021), 12-7 (same).) The incidents leading to the *Stafford* cases, however, arose after the initial coverage period ended. (*See* ECF No. 12-8 (July 6, 2022), 12-9 (Feb. 7, 2023).) Plaintiffs renewed their insurance policy (under the same terms) to cover April 1, 2022 through April 1, 2023 (P-SUMF ¶ 2; D-SUMF ¶ 2), which would have provided coverage for both of the *Stafford* cases. However, this renewal was not alleged in Plaintiffs' initial Complaint (*see* ECF No. 1-1). Regardless, because the Court decides herein that the

5

Defendant (the "Insurance Policy")—which specifies that coverage extends over "[a]ny [a]uto"—Defendant had a duty to defend Plaintiffs for the accidents that occurred at the Landfill involving third-party "autos" (i.e., the municipal garbage trucks)). (*See* ECF No. 12-10, "Ins. Policy.")

Defendant disagreed. It issued coverage position letters denying coverage with respect to each of the six lawsuits. (P-SUMF ¶ 13; *see* ECF No. 12-11; ECF No. 12-12.[3]) In these letters, Defendant acknowledged that under Plaintiffs' coverage, Defendant was required to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' *to which this insurance applie[d]*, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto.'" (*See, e.g.*, ECF No. 12-11 at 8 (emphasis added); *see also* Ins. Policy at 46.) Further, Defendant acknowledged the "duty to defend any 'insured' against a 'suit' asking for such damages . . . . However, [Defendant had] no duty to defend any 'insured' against a 'suit' seeking damages for 'bodily injury' or 'property damage' . . . *to which this insurance d[id] not apply*. . ." (ECF No. 12-11 at 8 (emphasis added); *see also* Ins. Policy at 46.) To this end, Defendant's ultimate position was consistent in each letter:

> The [Insurance] Auto Policy does not apply to the claims asserted against the [Plaintiffs] in the [state court actions] because those claims do not arise out of their ownership, maintenance or use of an auto. The claims against [Plaintiffs] arise out of their alleged ownership or operation of the premises where the accident[s] took place, and [Defendant']s auto policy does not apply to such claims.

(ECF No. 12-12 at 4; *see* ECF Nos. 12-11 at 4, 12-11 at 9, 12-12 at 13.)

---

Insurance Policy does not invoke a duty to defend with respect to the state lawsuits at-issue, it does not address the deficiencies in Plaintiffs' Complaint with respect to alleging the policy renewal. In other words, even if the Court permitted Plaintiffs to amend their pleading to allege the renewal, Defendant would still have no duty to defend because the Insurance Policy does not provide coverage for accidents involving third-party garbage trucks.

[3] The parties only appear to have provided the Court with four out of the six coverage position letters. (ECF Nos. 12-11, 12-12.) However, it does not appear to be in dispute that six letters denying coverage were ultimately issued in total. (P-SUMF ¶ 13.)

B. PROCEDURAL BACKGROUND

On December 26, 2024, dissatisfied with Defendant's denial of coverage, Plaintiffs filed the instant case in the Superior Court of New Jersey, Law Division, Monmouth County. (*See* ECF No. 1-1.) Plaintiffs' Complaint brings four state law claims: (1) Breach of Contract; (2) Declaratory Judgment; (3) Breach of the Covenant of Good Faith and Fair Dealing; and (4) Bad Faith (*Pickett v. Lloyds*) and Unreasonable Denial of Coverage. (*See generally id.*) The allegations across the four causes of actions follow similar paths: Plaintiffs allege that Defendant "wrongfully denied its duty to defend and to provide coverage" and is thus "liable for the costs [Plaintiff] has incurred to date and will continue to incur to defend these lawsuits." (*Id.* ¶¶ 9, 12.) In addition to seeking compensatory damages in the form of costs, damages, and expenses incurred by Plaintiffs in defending themselves in state court, Plaintiffs seek a declaration that (i) Defendant is liable for any costs, damages, and expenses arising in state court, and that (ii) Plaintiffs are entitled to punitive damages. (*Id.* at 7.)

On February 7, 2025, Defendant removed the matter to this Court pursuant to 28 U.S.C. § 1441 (removal) and 28 U.S.C. § 1332 (diversity jurisdiction). (ECF No. 1.) The case sprinted quickly through litigation from there: Defendant answered on February 14, 2025 (ECF No. 7), the parties exchanged initial discovery pursuant to Fed. R. Civ. P. 26 (*see* ECF No. 9), and, at a conference with the Honorable J. Brendan Day, U.S.M.J. on March 24, 2025, the parties agreed that no further discovery was required prior to moving for summary judgment. Accordingly, the parties cross-moved for summary judgment on June 13, 2025, less than six months after the case was first filed in state court. (*See* ECF Nos. 12, 13, 14, 15.)

By way of summary: On September 24, 2025, the Court held a teleconference with lead counsel for the parties whereby counsel confirmed that each of the six state lawsuits had either

settled or voluntarily dismissed Plaintiffs. (Transcript at 5:14–22, 6:06–12.) The parties further confirmed that this meant the only remaining issue for the Court to decide in the cross-motions for summary judgment was whether Defendant had a duty to defend Plaintiffs in those lawsuits and, consequently, Plaintiffs were entitled to the costs, fees, and expenses they accrued litigating the cases themselves. (*Id.* at 7:01–7:06; *see id.* at 6:23–25 (confirming Plaintiffs no longer seek indemnification from Defendant).) Both parties acknowledged that the issue of Defendant's duty to defend is dispositive to the case, meaning resolution of the issue disposes of all of Plaintiffs' claims in the Complaint. (*Id.* at 7:08–7:13, 8:09–21; *see id.* at 9:15–10:08.)

## II.   <u>LEGAL STANDARD</u>

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "[T]he party opposing summary judgment must produce evidence which could be 'reduced to admissible evidence' at trial." *ABD Monroe, Inc. v. Monroe Twp.*, No. 04-1412, 2008 WL 58876, at *4 (D.N.J. Jan. 3, 2008) (quoting

*Celotex*, 477 U.S. at 327). That is, the party seeking to introduce such evidence "must demonstrate that she will be able to reduce it to an admissible form at trial." *Jasmin v. N. J. Econ. Dev. Auth.*, No. 16-1002, 2020 WL 3411171, at *8 (D.N.J. June 22, 2020). The court must view all facts "in the light most favorable to the nonmoving party." *Turco v. City of Englewood, N.J.*, 935 F.3d 155, 161 (3d Cir. 2019).

### III. DISCUSSION

As previously stated, the only issue before the Court is whether Defendant had a duty to defend Plaintiffs in the six since-resolved lawsuits filed against them in state court. (*See* ECF No. 14-1 (seeking order "compelling Defendant . . . to defend six (6) lawsuits against [Plaintiffs]").) Plaintiffs point to two separate bases for their contention that Defendant was required to defend them: (i) the Insurance Policy itself, and (ii) New Jersey's compulsory auto insurance statute. The Court begins by outlining the principles utilized in interpreting the Insurance Policy before applying those principles to the Insurance Policy at-issue.

#### A. INTERPRETING INSURANCE POLICIES

Under New Jersey law,[4] "[a]n insurer is contractually obliged to provide the insured with a defense against all actions covered by the insurance policy." *Abouzaid v. Mansard Gardens Assocs., LLC*, 23 A.3d 338, 346 (N.J. 2011). "The duty to defend is triggered by the filing of a complaint alleging a covered claim." *Id.* "Generally, to ascertain whether there is a duty to defend, 'the complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment,' with any doubts 'resolved in favor of the insured.'" *Norman Int'l v. Admiral Ins. Co.*, 279 A.3d 425, 432 (N.J. 2022) (quoting *Abouzaid*, 23 A.3d at 346). Therefore, when the complaint "comprehends an

---

[4] The parties appear to both agree that New Jersey law applies. (Pl. MSJ at 6; Def. C-MSJ at 1.)

injury which may be within the policy," insurers have a duty to defend against that complaint. *Danek v. Hommer*, 100 A.2d 198, 203 (N.J Super. Ct. App. Div. 1953) (citation omitted). This duty is implicated regardless of the likelihood that the complaint will succeed on its merits, and even when "the claims are poorly developed and almost sure to fail." *Vorhees v. Preferred Mut. Ins. Co.*, 607 A.2d 1255, 1259 (N.J. 1992).

The Court must construe the insurance policy at-issue and determine whether the complaints filed against the insured fall within the Policy's coverage provisions. In doing so, the Court interprets the language of the Policy "according to its plain and ordinary meaning." *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010) (quoting *Voorhees*, 607 A.2d at 1260). "If the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations." *Id.* "This is so even if a 'close reading' might yield a different outcome, or if a 'painstaking' analysis would have alerted the insured that there would be no coverage." *Id.* (internal citations omitted). Even so, the Court "should not write for the insured a better policy of insurance than the one purchased." *Walker Rogge, Inc. v. Chelsea Title & Guar. Co.*, 562 A.2d 208, 214 (N.J. 1989). Here, "the insured has the burden to bring the claim within the basic terms of the policy." *S.T. Hudson Eng'rs, Inc. v. Pa. Nat. Mut. Cas. Co.*, 909 A.2d 1156, 1163 (N.J. Super. Ct. App. Div. 2006) (citation omitted).

### B. INSURANCE POLICY AT-ISSUE

Plaintiffs maintained a commercial auto insurance policy with Defendant, No. 88A5CA0000840-00. (P-SUMF ¶ 1.) No party contests that the Insurance Policy was specifically an auto insurance policy, as opposed to an all-purpose premises liability insurance policy.

Additionally, no party contests that the Insurance Policy was active during the events that led to both the *Alton* cases and the *Barnshaw* cases.[5]

According the language of the Insurance Policy its "plain and ordinary meaning," *see Flomerfelt*, 997 A.2d at 996, Plaintiffs' auto coverage extends over "[a]ny '[a]uto.'"[6] (Ins. Policy at 34, 45.) Notably, while other types of auto coverage are defined in the Insurance Policy, the "[a]ny '[a]uto'" coverage designation includes no explicit definition. This is illustrated most clearly in a chart contained in the Insurance Policy which sets out the definitions of the various kinds of auto coverage available:

| **Description Of Covered Auto Designation []** | |
|---|---|
| Any "Auto" | |
| Owned "Autos" Only | Only those "autos" you own . . . . This includes those "autos" you acquire ownership of after the Policy begins. |
| Owned Private Passenger "Autos" Only | Only the private passenger "autos" you own. This includes those private passenger "autos" you acquire ownership of after the Policy begins. |
| Owned "Autos" Other Than Private Passenger "Autos" Only | Only those "autos" you own that are not of the private passenger type . . . This includes those "autos" not of the private passenger type you acquire ownership of after the Policy begins. |
| Owned "Autos" Subject To No-fault | Only those "autos" you own that are required to have no-fault benefits in the state where they are licensed or principally garaged. This includes those "autos" you acquire ownership of after the Policy begins provided they are required to have no-fault benefits in the state where they are licensed or principally garaged. |
| Owned "Autos" Subject To a Compulsory Uninsured Motorists Law | Only those "autos" you own that because of the law in the state where they are licensed or principally garaged are required to have and cannot reject Uninsured Motorists Coverage. This includes those "autos" you acquire ownership of after the Policy begins provided they are subject to |

---

[5] As stated previously herein, whether or not the *Stafford* cases—which arose in July 2022 and February 2023—were covered by a renewal of the Insurance Policy is contested by the parties but need not be resolved herein. In the event that the Policy was not in place for the *Stafford* cases, that would present an alternative basis to grant Defendant's Cross-Motion for Summary Judgment.

[6] The Insurance Policy defines "auto" to mean: (1) "[a] land motor vehicle, 'trailer' or semitrailer designed for travel on public roads;" or (2) "[a]ny other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law where it is licensed or principally garaged." (Ins. Policy at 54.)

|  | the same state uninsured motorists requirement. |
|---|---|
| Specifically Described "Autos" | Only those "autos" described in Item Three of the Declarations for which a premium charge is shown . . . . |
| Hired "Autos" Only | Only those "autos" you lease, hire, rent or borrow. This does not include any "auto" you lease, hire, rent or borrow from any of your "employees" . . . . |
| Non-owned "Autos" Only | Only those "autos" you do not own, lease, hire, rent or borrow that are used in connection with your business. This includes "autos" owned by your "employees," partners (if you are a partnership), members (if you are a limited liability company) or members of their households but only while used in your business or your personal affairs. |

(*Id.* at 45.)

The space next to "[a]ny '[a]uto'" in the above chart (reproduced from the Insurance Policy) is blank. This lack of explicit written definition of "[a]ny '[a]uto'" presents an interpretative problem for the Court to resolve: although the Insurance Policy *requires* Defendant to both (i) pay damages caused by an accident "resulting from the ownership, maintenance or use of a covered 'auto,'" and (ii) "defend any 'insured' against a 'suit' asking for such damages, these obligations only arise *if* the insurance "applies" (*see id.* at 45 (emphasis added)). In Plaintiffs' case, this means the obligations only arise—and Defendants were only required to defend in the six state lawsuits—*if* the third-party municipal garbage trucks fall within the scope of this arguably undefined term.

Plaintiffs, unsurprisingly, argue for the most expansive possible interpretation of "[a]ny '[a]uto,'" positing that the term "contains NO limitations." (Pl. Reply at 2 (emphasis in original).) According to Plaintiffs, this means that "regardless of an auto's status as owned, non-owned, borrowed, or whatever, it is covered by the policy." (*Id.*) Put another way, Plaintiffs argue that Defendant has a duty to defend them in the six state cases because each case involves a garbage truck—*i.e.*, an auto—and the Insurance Policy, by its terms, covers those garbage trucks because

they are autos.

For its part, Defendant asserts that Plaintiffs' limitless definition "defies common sense." (Def. C-MSJ at 15.) Defendant, urging that the term "is not intended to, and does not, include any auto in the world," argues that "'any auto' refers only to any vehicle which would *otherwise qualify for coverage* under one of the categories of a covered auto provided under the Auto Policy." (*Id.* at 14 (emphasis added).) Applying Defendant's interpretation, the garbage trucks at-issue in the six state cases would not be covered (and Defendant would not have a duty to defend), because none of the other defined auto coverage categories (set forth in the reproduced chart at 11–12, *supra*) contemplate coverage over third-party owned-and-operated vehicles under the present facts. Indeed, the other categories very explicitly cover "[o]nly those 'autos' [the insured] own[s] . . .," "[o]nly those 'autos' [the insured] lease[s], hire[s], rent[s], or borrow[s]," and "[o]nly those 'autos' [the insured] do[es] not own, lease, hire, rent or borrow that are used in connection with [the insured's] business."[7] (Ins. Policy at 45–46.)

There are no allegations the garbage trucks were owned, leased, hired, rented, or borrowed by Plaintiffs or even that the garbage trucks were used in connection with Plaintiffs' "business"—Plaintiffs here were nothing more than absentee landlords who merely collected rent payments from O.C. Landfill, the actual operator of the Landfill. (Transcript at 4:09–12, 19–21); *see, e.g.*, *O'Shea v. Welch*, 101 F. App'x 800, 805 (10th Cir. 2004) (non-precedential) ("'[I]n your business' or 'in connection with your business' is equivalent to 'scope of employment.'" (collecting cases)). The garbage trucks were used in connection with the business of the third-party municipalities, not Plaintiffs. *See, e.g.*, *Adams v. Thomason*, 753 So.2d 416, 421 (La. Ct. App. 2000) ("To hold

---

[7] There is also a category for "'autos' described in Item Three of the Declarations" of the Insurance Policy, (Ins. Policy at 45), and a category for "mobile equipment subject to compulsory or financial responsibility or other motor vehicle insurance law." (*Id.* at 46.) There are no arguments before the Court that these categories are applicable in this case.

13

otherwise would . . . be tantamount to providing coverage . . . to any vehicle driven by any person . . ."). Thus, Plaintiffs' arguments for an unduly broad interpretation of "[a]ny '[a]uto'" are untethered from the explicit terms of the Insurance Policy and strain the bounds of reason, credulity, and common sense.

Further, while "[a]ny '[a]uto'" coverage does not appear to have ever been squarely addressed by a New Jersey court, there is a significant collection of instructive and persuasive authority from around the country. For example, in *Liberty Mutual Insurance Co. v. Mid-Continent Insurance Co.*, a 2003 case out of the Northern District of Texas, the parties similarly disagreed as to the definition of "any auto" in an insurance policy. *See* 266 F. Supp. 2d 533, 544 (N.D. Tex. 2003), *rev'd on other grounds*, 508 F.3d 261 (5th Cir. 2007). Like Plaintiffs here, one party argued that the term "any auto" should be construed "literally." *Id.* There, the court found this interpretation to be "unreasonable" and "absurd," concluding that "[t]he clear intent of the parties . . . was to cover autos owned or operated by [the insured]. In essence, [defendant] contends that [plaintiff] provided auto insurance for *every car that passed through the construction zone.* That is not a literal reading, but a ludicrous reading of the policy." *Id.* at 544–45 (emphasis added).

Applying *Liberty Mutual*'s hypothetical here, to interpret "[a]ny '[a]uto'" as broadly as Plaintiffs—who are merely the lessors of the property upon which the Landfill sits—would require Defendant to insure every car (and garbage truck) that passes through the Landfill on any given day—an "absurd" and "unreasonable" result. *See id.* To illustrate the far-reaching implications of Plaintiffs' interpretation, Defendant offers an illustrative hypothetical wherein "the millions of vehicles that pass through McDonald's drive-throughs would be deemed covered autos . . . under an automobile insurance policy" issued to an absentee landlord who leased the property to a McDonald's franchisee. (Def. Reply at 2.) Surely, such coverage would create a far "better policy

14

of insurance than the one purchased." *Walker Rogge, Inc.*, 562 A.2d at 214.

To be sure, the Northern District of Texas is not the only court that has refused to give "any auto" an unlimited meaning. Numerous federal and state courts have similarly concluded that to read-in such an expansive definition would be illogical and unworkable; these courts instead have chosen to adopt a definition that takes into consideration the other categories within the insurance policy itself, akin to the other categories explicitly set forth and referenced hereinabove in the policy at bar. *See, e.g.*, *Goodno v. Endurance Am. Specialty Ins. Co.*, No. 21-30071, 2021 WL 4394961, at *3 (5th Cir. Sept. 24, 2021) (non-precedential) ("Category 1 covers 'Any Auto' that MCS-LA owned, borrowed, leased, hired, rented, or used in the course of its business. It cannot be that MCS-LA would purchase insurance for any conceivable auto, including autos with which it has no connection."); *Mossman v. Transamerica Ins. Co.*, 816 F. Supp. 633, 637 (D. Haw. 1993) (rejecting argument that "any auto is eligible for coverage under the policy, regardless [of] whether that auto has any connection with the named insured"), *aff'd* 28 F.3d 107 (9th Cir. 1994); *CMH Homes, Inc. v. U.S. Fidelity & Guar. Co.*, No. 05-552, 2007 WL 595606, at *3–4 (E.D. Tenn. Feb. 21, 2007) (rejecting the argument that "the word 'any' [] encompasses any and every auto" and determining that "the 'Any Auto' language, in combination with the surrounding circumstances, is sufficiently broad to encompass the subsequent categories . . . in the covered auto section of the policy"); *Bamber v. Lumbermens Mut. Cas. Co.*, 680 A.2d 901, 903 (Pa. Super. Ct. 1996) ("While the term 'Any Auto' is not defined in the policy, the meaning of the term, as it is used in the policy, logically refers to all autos falling within the subsequent limited categories . . . ."); *Donegal Mut. Ins. Co. v. Action Bus. Ctr., Inc.*, No. 97C-06-029, 1999 WL 1568618, at *7 (Del. Super. Ct. Oct. 21, 1999) ("Pursuant to the first page of the Business Auto Endorsement Declaration[,] liability coverage under the policy was provided for 'Any Auto' . . . The term 'Any Auto' logically refers

to and includes all the autos described in the subsequent categories . . .").[8]

These cases, which all interpreted policy language identical or quite similar to the language at-issue here, provide support for the commonsensical conclusion that "Any Auto" cannot be defined boundlessly without limitation, and is instead subject to the definitional limitations contained in the other coverage categories within the Insurance Policy, none of which Plaintiffs fall into here.

Ultimately, Plaintiffs have not met their burden to show that the sought-after defense is the kind that is contemplated by the Insurance Policy. Indeed, Defendant's argument is more persuasive: even though the garbage trucks are, strictly defined, autos, the Insurance Policy does not cover these trucks because Plaintiffs did not own or operate them. Accordingly, Defendant does not have a duty to defend Plaintiffs in the six state court actions under the terms of the Insurance Policy.

### C. NEW JERSEY STATUTORY LAW

Without the terms of the Insurance Policy to rely upon, Plaintiffs separately pursue a different avenue to attempt to establish Defendant's duty to defend: New Jersey statutory law. New

---

[8] Plaintiffs, attempting to meet their burden, posit that *Foremost County Mutual Insurance Co. v. Home Indemnity Co.* supports their position, but *Foremost*'s definition of "any automobile" is distinguishable. (*See* Pl. Reply at 6–7.) In *Foremost*, the Fifth Circuit was faced with interpreting the phrase "any automobile" in a home insurance policy. *Foremost Cnty. Mut. Ins. Co. v. Home Indem. Co.*, 897 F.2d 754, 756 (5th Cir. 1990). The court held that "'any automobile' should be interpreted literally; if [defendant] wanted to limit coverage to owned automobiles that were listed on the schedule, it could have included this provision simply by saying, 'any scheduled automobile, hired automobile, or non-owned automobile, as defined in the policy' instead of 'any automobile.'" *Id.* However, in *Foremost*, the plaintiff *himself operated and seemingly owned* the subject vehicle, but that vehicle was simply not listed on any insurance schedule. *Id.* Defendants refused to provide coverage for an injury sustained from driving the unlisted vehicle, but the Fifth Circuit disagreed. *Id.* The present case stands in stark contrast to the Fifth Circuit's decision; here, Plaintiffs neither owned, nor operated, nor had any control over the garbage trucks at-issue, nor were they themselves injured by the trucks. Accordingly, *Foremost*'s holding, that automobiles need not "be listed on the schedule as an absolute prerequisite to any coverage for that automobile's driver" does not rescue Plaintiffs here. *See* 897 F.2d at 757.

Jersey requires that

> [e]very owner or registered owner of a motor vehicle registered or principally garaged in this State shall maintain motor vehicle liability insurance coverage . . . insuring against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of the ownership, maintenance, operation or use of a motor vehicle. . . .

N.J. Stat. Ann. § 39:6B-1(a). According to Plaintiffs, this statutory provision compels Defendant to provide coverage to Plaintiffs for the injuries sustained arising out of the "ownership, maintenance, operation or use" of the garbage trucks at-issue in the six state cases.[9]

Despite Plaintiffs' citations to a variety of factual scenarios depicting the different ways that vehicles can be "used" pursuant to this statute (Pl. MSJ at 9), Plaintiffs seem to gloss over a key phrase at the beginning of the statute: "[e]very *owner or registered owner* of a motor vehicle." N.J. Stat. Ann. § 39:6B-1(a). By its plain text, this statute only requires *vehicle owners* to obtain auto insurance, because the insurance only covers injury sustained to or by the vehicles that the insured owns. To construe this statute more broadly would lead to an illogical result. If New Jersey law compelled coverage of injuries sustained for or by any third-party vehicle, then every single person in New Jersey, regardless of whether they own a vehicle themselves, would be required to purchase auto insurance. Obviously, this is not the case.

To read New Jersey's compulsory auto insurance statute as requiring Defendant to defend Plaintiffs in the six state actions would also contravene the policy behind the statute. This statute is "motivated by the 'overriding legislative policy of assuring financial protection for the innocent victims of motor vehicle accidents.'" *Carolina Cas. Ins. Co. v. Travelers Prop. Cas. Co.*, 90 F. Supp. 3d 304, 319 (D.N.J. 2014) (quoting *Pisaneschi v. Turner Const. Co.*, 785 A.2d 50, 55 (N.J.

---

[9] The Insurance Policy itself also includes coverage and defense for damages resulting from the "ownership, maintenance or *use* of a covered 'auto.'" (Ins. Policy at 46 (emphasis added).)

Super. Ct. App. Div. 2001)). "However, it is not intended to insure all defendants against all claims arising from any accident in any way incident to loading/unloading irrespective of causation, that is, irrespective of the defendant's actual involvement with the insured vehicle itself." *Pisaneschi*, 785 A.2d at 55.

Here, to be clear, the "insured vehicle" is *not* the garbage trucks that tipped over or were otherwise damaged—those vehicles, were presumably insured by their respective owners. Instead, the "insured vehicle" whose coverage Plaintiffs contend compels Defendant to defend them are the business vehicles that *Plaintiffs* own. These vehicles must exist, because Plaintiffs bought an insurance policy to cover them, but they elude any involvement or description in the present action. (*See* Pl. Reply at 6 (referring broadly to the insured vehicles owned by Atlantic Pier and Hesse).) To be sure, none of the state court plaintiffs were injured by Atlantic Pier's vehicles, only by Atlantic Pier's real property. Furthermore, Plaintiffs have not explained how their auto insurance policy, which they obtained pursuant to New Jersey statute, would be required to cover damage from third-party vehicles with which the insured vehicles never came in contact. Accordingly, the New Jersey compulsory auto insurance statute is not intended to—and does not—give rise to a duty to defend under the present circumstances.

Consequently, Plaintiffs have not met their burden to show that under either the explicit terms of the Insurance Policy or New Jersey's compulsory auto insurance statute is Defendant required to defend Plaintiffs in the six actions pending in state court. *See S.T. Hudson Eng'rs*, 909 A.2d at 1163. Thus, Plaintiffs' Motion for Summary Judgment seeking an order "compelling Defendant . . . to defend six (6) lawsuits against [Plaintiffs]" is **DENIED**, Defendant's Cross-Motion for Summary Judgment is **GRANTED**, and the Complaint is **DISMISSED**.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (ECF No. 14) is **DENIED**, and Defendant's Cross-Motion for Summary Judgment (ECF No. 12) is **GRANTED**. An appropriate Order accompanies this Opinion.

_____
ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: September 25, 2025